**E-FILED on**   5/30/06

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re ESS TECHNOLOGY, INC. SECURITIES LITIGATION<br><br>This Document Relates to:<br>    ALL ACTIONS. | No. C-02-04497 RMW<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND<br><br>**[Re Docket No. 225]** |

    Plaintiffs move for leave to amend the Second Amended Complaint ("SAC") filed by lead plaintiff Steve Bardack ("Bardack"). Plaintiffs have filed a Proposed Third Amended Complaint ("PTAC") concurrent with their motion. Plaintiffs in this securities class action consist of all persons and entities who purchased or otherwise acquired the publicly traded securities of ESST during the period beginning August 1, 2002 through and including September 12, 2002, excluding short sellers, officers and directors of ESS Technology, Inc. ("ESST"), as well as their families and the families of defendants. Defendants ESST, Robert L. Blair ("Blair"), Patrick Ang ("Ang"), Frederick S. L. Chan ("Chan"), and James Boyd ("Boyd") oppose the motion. The court heard oral argument by the parties on May 19, 2006. The court has read the moving and responding papers and

considered counsels' arguments. For the reasons set forth below, the court DENIES plaintiffs' motion for leave to amend.

## I. BACKGROUND

### A.   Allegations in the Proposed Third Amended Complaint

This securities fraud action was initially brought on behalf of a class of persons who purchased the publicly-traded securities of ESST between January 23, 2002 and September 12, 2002 ("Initial Class Period"). The court's December 1, 2004 Order denied in part and granted in part Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint and Strike Portions Thereof ("Dec. 2004 Order") and the court's February 22, 2005 Order granted in part Defendants' Motion to Strike Allegations in Plaintiff's Second Amended Complaint ("Feb. 2005 Order").

Defendant ESST is a designer, developer, and marketer of highly-integrated digital processor chips used in multimedia applications. Chan, Blair, Boyd, and Ang are ESST's founder and chairman, president and chief executive officer, chief financial officer, and chief operating officer, respectively. It is not disputed that ESST met or exceeded its publicly announced revenue forecasts for the first and second quarter of 2002. *See* Feb. 2005 Order at 4-5. The premise for this action is ESST's announcement on September 12, 2002 that it would not meet its performance expectations for the third quarter of 2002 and the subsequent sharp decline in ESST's share price. *See* Dec. 2004 Order at 3-4. Plaintiffs claim that prior to September 12, 2002 certain ESST officers made falsely optimistic statements regarding ESST's performance to boost the share price. The court previously determined that the earliest time plaintiffs have adequately alleged defendants knew of the shortfalls announced on September 12 was sometime in August 2002. Feb. 2005 Order at 9. As such, the court's Feb. 2005 Order set the class period from August 1, 2002 to September 12, 2002 ("Current Class Period"). *Id.* Plaintiffs contend that evidence obtained through discovery reveals an additional false statement and also provides support that the class period should run from April 24, 2002 to September 12, 2002 ("Proposed Class Period"). Pls.' Mot. at 1.

In particular, during discovery plaintiffs obtained "Daily Flash Report Summaries" and weekly "Executive K-Unit/K-Dollar Reports" which show ESST backlog[1] and billing trends,[2] and a rolling forecast report. Pls.' Mot. at 1, 4; PTAC ¶¶ 7, 8, 16.[3]  These reports indicate declines in backlog and billings levels starting as early as April 24, 2002, and failure to meet internal revenue forecast for June sometime in July 2002.[4]  *Id.*  Plaintiffs contend that defendants Blair, Boyd, and Chan knew of these declines in backlog and billing trends when they made misleading statements during the Proposed Class Period.  *Id.*  In support plaintiffs offer a new confidential witness ("CW14").  According to the PTAC, CW14 is familiar with all three of these reports and has seen them before.[5]  PTAC ¶ 26(n).  CW14 states that he recalls Blair's secretary handing Blair the Daily Flash Report Summaries and the Executive K-Unit/K-Dollar Reports and that these two types of reports were reviewed by Blair, Boyd, and Chan in regular weekly and monthly meetings.  *Id.*  According to the complaint, CW14 confirms that Blair, Boyd, and Chan did in fact receive the Daily Flash Report Summaries and the Executive K-Unit/K-Dollar Reports because "they were each very 'hands on' and wanted to know every detail of the business."  *Id.*  As plaintiffs argument goes, defendants knew of, but concealed, the trend of deteriorating backlog as early as April 24, 2002, and thus statements made as early as April 24, 2002 are actionable.

On April 24, 2002, in a quarterly conference call, Blair told analysts "[t]ypically going into a quarter, we have approximately 40 percent of the end shipments on backlog, and we believe this quarter's no different." PTAC ¶ 3, 34.  When asked whether backlog going into the second quarter was about the same as going into the first quarter, Blair responded, "[i]t's, yes, similar."  *Id.*

---

[1] Backlog refers to orders for products that have not yet been shipped. Pls.' Mot. at 5.

[2] Both the Daily Flash Report Summaries and the Executive K-Unit/K-Dollar Reports provide backlog and billing information.

[3] All references to the PTAC refers to the Corrected PTAC filed by plaintiffs on May 5, 2006.

[4] The PTAC does not state when in July 2002 defendants alleged learned that ESST had missed its June 2002 internal forecast.  *See* PTAC ¶8.

[5] The PTAC references that CW14 has seen the rolling forecast report before and was familiar with it, but makes no factual allegations to support that any of the defendants received or reviewed the rolling forecast report at issue.

1  Plaintiffs allege that at the time the backlog and billings reports indicated that backlog going into the
2  first quarter was approximately 37% of first quarter revenues while backlog going into the second
3  quarter was 22% of the forecast revenues for the second quarter. *Id.* ¶¶ 4, 34.  At a point in time
4  nineteen days into the second quarter (April 19, 2002) ESST had total billings and backlog of $40.9
5  million[6] compared to total billings and backlog of $39.6 million eighteen days into the first quarter
6  (January 18, 2002).  Pls.' Mot. at 7.[7]
7          On June 18, 2002 ESST issued a press release that included the statement "demand has
8  continued to be strong as our new customers ramp up their production." *Id.* ¶ 36.  Further, "[t]he
9  second half of 2002 is also looking stronger than previously expected, and we will provide new,
10 increased guidance, with additional details and updates, when we report our second quarter results."
11 *Id.*  Plaintiffs contend that defendants made these statements when they "knew orders were
12 weakening." Pls.' Mot. at 6.  The backlog reports indicate that as of June 17, 2002 backlog was less
13 than half of the backlog during the same time frame heading into the second quarter. *Id.*  Total
14 backlog heading in to the second quarter was "nearly three times as much" as total backlog heading
15 into the third quarter. *Id.*
16         On June 24, 2002 ESST issued a press release that included the statement "ESS Technology
17 continues to see strong demand for digital entertainment products both for the current quarter and
18 throughout the balance of 2002." *Id.* ¶ 5.  In that same press release defendants increased their
19 guidance for the third quarter to $86-$90 million. *Id.*  Plaintiffs assert that, looking at backlog
20 figures ten days before the start of a quarter, backlog was $10.9 million ten days before the second
21 quarter started and $5.3 million—a 50% decrease—ten days before the beginning of the third
22 quarter. *Id.*  Therefore, plaintiffs contend that the June 24, 2002 press release statements were false
23 when made and that defendants concealed the decline in future orders from investors. *Id.*

---

[6]     Elsewhere the PTAC states that on April 22, 2002 the Executive K-Dollar report indicated second quarter shipments and backlog of $35 million.  PTAC ¶ 56.

[7]     The court refers to plaintiffs' brief where the citations to the (corrected) PTAC in plaintiffs' brief in support of their motion appear erroneous and the particular paragraph of the PTAC to which plaintiffs refer remains unclear to the court.  The court also notes that some of the charts in the PTAC are unclear as they refer to inconsistent dates. *See, e.g.*, PTAC ¶¶ 52-53.

ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND
C-02-04497 RMW
SPT                                                      4

1    On July 24, 2002 defendants issued a press release with their second quarter financial results and held their second quarter conference call with analysts. *Id.* ¶¶ 9, 38-39. The press release reiterated the third quarter guidance: "we expect to grow our DVD unit shipment by 10%-15% in the third quarter of 2002 compared to the second quarter, and expect overall revenues for the third quarter to be $86-$90 million." *Id.* ¶ 38. Blair stated during the call that "[l]ooking forward, we believe that in Q3 . . . revenue will be up from our second quarter that we just completed." *Id.* ¶39. Blair noted that despite the continued decline in PC shipments, "[w]e are projecting both DVD and VCD shipments to grow in the third quarter." *Id.* Blair again reiterated the same revenue guidance for the third quarter. *Id.* ¶¶ 9, 39. Plaintiffs contend that when defendants made these statements in July 2002, the rolling forecast report indicated that ESST had missed its internal forecast for the month of June 2002 by $7.2 million. *Id.* ¶ 8. In addition, the backlog report indicated that backlog going into the third quarter was 13% of the forecast revenues for the third quarter. Plaintiffs also assert that, looking at a point in time approximately 18 days into each of the first, second, and third quarters, backlog had dropped from $24.4 million for the first quarter to $17.3 million for the second quarter, to $9.5 million for the third quarter. *Id.* ¶ 7.[8]

Based on these new allegations, plaintiffs seek to amend the Current Class Period (August 1, 2002 through September 12, 2002) to the Proposed Class Period (April 24, 2002 through September 12, 2002). Additional underlying facts are discussed more fully in the Dec. 2004 Order and the Feb. 2005 Order.

**B.    Procedural Background**

On January 21, 2003 the court appointed Bardack to serve as lead plaintiff for the proposed class. Bardack then filed an amended complaint on February 6, 2003, which defendants moved to dismiss. Prior to the noticed May 23, 2003 hearing on the motion and upon stipulation by the parties, Bardack then filed a First Amended Complaint.[9] Defendants again moved to dismiss which

---

[8]    Because the court has held that plaintiffs' SAC adequately pled knowledge sometime in August 2002 and set the class period from August 1, 2002, the court does not address the allegations for the period on or after August 1, 2002 in this order.

[9]    Though styled "First Amended Complaint" this was the second amended complaint.

the court granted with 30 days leave to amend the complaint. On November 3, 2003 Bardack filed a Second Amended Complaint ("SAC").[10] In the Dec. 2004 Order the court denied in part and granted in part defendants' motion. Leave to amend was denied given that plaintiffs had had "ample opportunity to plead a viable complaint." Dec. 2004 Order at 19. On December 22, 2004 defendants filed a motion to strike further allegations in the SAC. In the Feb. 2005 Order the court granted defendants' motion in part by striking from the SAC claims of alleged fraudulent conduct occurring before August 1, 2002 from plaintiff's second amended complaint. Therefore, the operative complaint is the SAC as modified by the Dec. 2004 Order and Feb. 2005 Order.

On March 25, 2005, defendants filed their responsive pleading. Thereafter, discovery commenced. On February 8, 2006 the court issued an order granting in part Bardack's motion for class certification. On March 24, 2006 plaintiffs filed the present motion for leave to amend the SAC. In connection the parties have stipulated to vacate the original May 15, 2006 date for close of fact discovery. Plaintiffs concurrently filed their PTAC.

## II. ANALYSIS

### A. The PSLRA

Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") in large part to deter abusive and frivolous securities fraud claims. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003) (citing *Silicon Graphics*, 183 F.3d at 973); *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005) (citation omitted) (amended decision) ("Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.'"). As the Ninth Circuit has explained, the abuses in securities class action suits sought to be deterred by the PSLRA include:

> (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of deep pocket defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.

---

[10] Though styled "Second Amended Complaint" this was the third amended complaint.

1 *SG Cowen Securities Corp. v. United States Dist. Ct.*, 189 F.3d 909, 911 (9th Cir.1999).  "Congress
2 enacted the mandatory stay of discovery, in part, to prevent plaintiffs from filing frivolous lawsuits
3 and using it as a vehicle 'in order to conduct discovery in the hopes of finding a sustainable claim not
4 alleged in the complaint.'"  *In re Lantronix, Inc. Securities Litig.*, 2003 WL 22462393, *1 (C.D. Cal.
5 2003) (citation omitted); *Feitelberg v. Credit Suisse First Boston LLC*, 2003 WL 22434098, *2
6 (N.D.Cal. 2003) (noting that the PSLRA was intended to deter "strike suits").  In doing so Congress
7 was acknowledging that the "cost of discovery often forces innocent parties to settle frivolous
8 securities class actions." *Id.* (citation omitted).

9     Defendants argue that the PSLRA bars attempts to use discovery to repair claims that cannot
10 stand without it.  Defs.' Opp. at 6-7.  However, the Ninth Circuit has not specifically addressed the
11 issue raised by the present motion:  whether a plaintiff may, under the PSLRA, broaden § 10(b)
12 claims that have survived motions to dismiss based on new evidence obtained after the opening of
13 discovery.  Defendants cite various cases that emphasize the policy behind the PSLRA.  *See e.g.,*
14 *Capital Ventures Int'l v. Network Commerce, Inc.*, No. C02-0682L, 2006 WL 681033 (W.D. Wash.
15 Mar. 16, 2006) (holding that opening discovery to permit plaintiffs to obtain evidence and amend
16 previously dismissed securities claims would be an "end run" around the PLSRA's pleading
17 requirement)[11]; *Medhekar v. District Ct.*, 99 F.3d 325, 328 (9th Cir. 1996) ("Congress clearly
18 intended that complaints in these securities actions should stand or fall based on the actual
19 knowledge of the plaintiffs rather than information produced by the defendants after the action has
20 been filed.")[12]; *Miller v. Champion Enters.*, 346 F.3d 660, 691-92 (6th Cir. 2003) (noting the district
21 court correctly held that "allowing repeated filing of amended complaints would frustrate the

---

[11] However, *Capital Ventures Int'l* concerns a district court's decision to permit plaintiff limited discovery *prior* to the time for lifting the stay of discovery under the PSLRA.

[12] *Medhekar* involved whether the court should permit the plaintiff to proceed with initial disclosures or whether such disclosures fell within the stay of discovery pending adequate pleading in the first instance by the plaintiff. As such, *Medhekar* does not address the issue of whether a complaint that meets the pleading requirements of the PSLRA may be amended based on additional evidence obtained after the stay of discovery has been lifted.

ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND
C-02-04497 RMW
SPT       7

1 purpose of the PSLRA")[13]; *but see Eminence Capital*, 316 F.3d at 1052 (noting that liberality in permitting leave to amend is especially important in the context of the PSLRA pleading requirements because "[i]n this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error").

The court finds that defendants' argument is not persuasive in the context of the present motion. The purpose and policy of the PSLRA is to discourage *baseless* suits. *Miller*, 346 F.3d at 691 (noting that the PSLRA's heightened pleading standard "evinces Congress's acknowledgment of the burden an allegation of securities fraud places on the innocent defendant"). The abusive litigation the PSLRA seeks to deter are frivolous suits which state no sustainable securities claim. Thus, the PSLRA seeks to prevent suits in which the foundation of securities fraud cannot be pled by imposing heightened pleading requirements and a stay of discovery. However, it does not follow from these policies that where a plaintiff has stated viable securities claims under the PSLRA, the PSLRA would otherwise restrict or modify the court's determination of whether to grant leave to amend under Fed. R. Civ. P. 15.[14]

### B.   Leave to Amend

#### 1.   Legal standard

Fed. R. Civ. P. 15(a)'s edict that "leave shall be freely given when justice so requires" is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (citations omitted)). "[P]rejudice to the opposing party . . . carries the greatest weight." *Eminence Capital*, 316 F.3d at 1052. "Adherence to these principles is especially important in the context of the PSLRA." *Id.*  Morever, in the Ninth Circuit, there is a strong policy permitting amendment even after a responsive pleading has been filed. *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1530 (9th Cir.1995). Nevertheless, "a district court need not grant leave to amend where the

---

[13] In *Miller*, the plaintiffs had not stated *any* viable claims under the PSLRA.

[14] The court does not find that plaintiffs seek to disobey the court's prior rulings which had denied plaintiffs leave to amend as the present motion for leave to amend is based on additionally discovered evidence.

amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 2006 WL 709199, *3 (9th Cir. 2006) (citations omitted) (certified for publication); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).

### 2.     Pleading requirements of the PSLRA

In opposing plaintiffs' motion, defendants argue that the new allegations cannot support an inference that defendants made the statements with the requisite state of mind under the PSLRA. The court agrees. Plaintiffs rely upon CW14 and CW8 to establish that defendants received and reviewed the reports, but fail to meet the PSLRA's requirements for confidential witnesses. In any event, even assuming defendants reviewed each of these reports, taking all inferences of plaintiffs' allegations, the reports of declines in backlog and billing do not give rise to a strong inference that defendants' June and July 2002 statements regarding third quarter revenue were made with either actual knowledge of their falsity or with deliberate recklessness with respect to falsity. Therefore, amendment based on the new evidence cited by plaintiffs would be futile.[15]

#### a.     Applicable state of mind

Under the PSLRA, "[a] complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (citations and quotations omitted); 15 U.S.C. § 78u-4(b)(1)-(2). To properly plead the required state of mind, a plaintiff must plead that defendants had knowledge of, or were deliberately reckless regarding, the falsity of public statements at the time the statements were made. *Id.; In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 975-88 (9th Cir. 1999). Where the challenged statement is a forward-looking statement, the plaintiff

---

[15] Moreover, the April 24, 2002 statement relates to backlog going into the second quarter. Plaintiffs could not allege that this statement caused the loss attributed to the September 12, 2002 announcement.

ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND
C-02-04497 RMW
SPT                                                                 9

must plead that the defendant had actual knowledge that the statement was false or misleading.[16]  15 U.S.C. § 78u-5(c)(1); *In re Daou Sys.,* 411 F.3d at 1021 (citations and quotations omitted); *Ronconi,* 253 F.3d at 429.  The court considers the totality of the plaintiffs' allegations and all reasonable inferences to be drawn from the allegations, whether favorable or unfavorable. *See In re Daou Sys.*, 411 F.3d at 1022.

The parties do not appear to dispute that the June 18, 2002, June 24, 2002, and July 24, 2002 statements are forward-looking, but plaintiffs argue that the April 24, 2002 statement is not forward-looking.[17]  Pls.' Reply at 8.  Therefore, as applicable here, plaintiffs need to establish a strong inference that defendants made the statements with either actual knowledge of its falsity or reckless disregard of its falsity.[18]

b.     Confidential witnesses

Plaintiffs' premise that defendants acted with either actual knowledge of falsity or deliberate recklessness with respect to falsity hinges on their allegations that defendants' received and reviewed the Daily Flash Report Summaries and the weekly Executive K-Unit/K-Dollar Reports which show then current ESST backlog and billing information and the monthly rolling forecast report that compared actual to forecast revenues.  Pls.' Mot. at 1-2, 4; PTAC ¶¶ 31-32.  According to the PTAC, defendants' "knowledge of ESST's order backlog and billings" is demonstrated by the following allegations: (1) statements by CW14 and CW8, (2) Blair "implicitly admitted that he was aware of and followed ESST's order backlog when he stated that a typical quarter began with order backlog of

---

[16]   Each of the statements in the period between April 24, 2002 and July 24, 2002 which plaintiffs seeks to add are contained in either ESST press releases or stated in ESST's quarterly conference calls announcing financial results.  The parties do not appear to dispute that the press releases and the conference calls were accompanied by cautionary language.  The court has previously found that these press releases contain "sufficient meaningful cautionary language related to its forward-looking statements in the releases to protect ESST under the PSLRA's Safe Harbor provisions."  Dec. 2004 Order at 14.

[17]   Plaintiffs also contend that any cautionary language was not sufficient given defendants' alleged knowledge based on the backlog and billing reports.

[18]   While plaintiffs' contention that the April 24, 2002 statement is not forward looking may have merit, the court does not reach that determination as it finds that plaintiffs have failed to allege the requisite state of mind of either actual knowledge or deliberate recklessness with respect to falsity.

40%" and made assurances regarding second quarter backlog, and (3) copies of the reports have allegedly been produced from Blair and Boyd's personal files.  PTAC ¶¶ 31-32.

In the Ninth Circuit, a plaintiff does not necessarily have to name his or her confidential witnesses.  *In re Daou Sys.*, 411 F.3d at 1015.  However, the Ninth Circuit "strictly adhere[s] to the PSLRA's mandate that the complaint state with particularity all facts on which a belief is formed, and in doing so, requires that a plaintiff reveal the source of her information."  *Id.* (citations and quotations omitted).  The confidential witness sources must be "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint [must] contain adequate corroborating details" such that the reliability of the source of information might be assessed.  *Id.*  In *In re Daou Sys.*, the Ninth Circuit found adequate particularity where the plaintiffs described the witnesses' job description and responsibilities, provided the witnesses' title, and stated to which executive the witnesses reported.  *Id.*

Here, plaintiffs allege that CW14 was a manager in ESST's operations department during and prior to the Class Period.  Other than that statement we know nothing about CW14, his responsibilities at ESST, and how he came to know the information he now states.  Instead, the PTAC merely alleges (1) CW14 is familiar with each of the three reports at issue and has seen them before, (2) CW14 states he recalls Blair's secretary handing Blair the backlog and billing reports and that these two reports were reviewed by Blair, Boyd, and Chan in regular weekly and monthly meetings, and (3) CW14 confirms that defendants in fact received the backlog and billing reports because they were very "hands on."  PTAC ¶ 26(n).  Plaintiffs' reply also asserts that CW8 confirms defendants' receipt of the weekly executive report and the Daily Flash Report.  Pls.' Reply at 7.  CW8 was allegedly a chip production planner responsible for planning and placing wafer and chip orders with ESST's manufacturers.  PTAC  ¶ 26(h).  Contrary to plaintiffs' allegations that CW14 stated that the Executive Reports and Daily Flash Reports were "prepared in ESST's marketing department with the assistance of Austin Sun" plaintiffs' allege that CW8, an individual who does chip production planning and placed orders, was one of the individuals responsible for generating the daily and weekly sales flash reports.  Plaintiffs also allege that CW8 personally distributed these

1 reports to Blair, though CW14 asserts that he saw Blair's secretary handing those reports to Blair.
2 *Id.*

3   Taken together, plaintiffs' allegations do not clearly establish a strong inference that defendants knew of the figures in the backlog and billing reports cited by plaintiffs at the time they made the June 18, 2002, June 24, 2002, and July 24, 2002 statements.  These allegations provide little information as to the basis of CW14's alleged knowledge and CW8's statements contradict rather than corroborate CW14's (and vice versa).  CW8's responsibilities, as alleged, indicates that he handles placing orders with suppliers rather than receiving orders from customers.  The description of CW8's responsibilities does not support the probability that a person in the position occupied by CW8 would be the preparer of the backlog and billing reports.[19]  In addition, "[g]eneral allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient." *In re Daou Sys.*, 411 F.3d at 1022.  Plaintiffs' contention that Blair's statements about backlog in a conference call in response to analyst inquiries implies that he "was aware of and followed ESST's order backlog" allows some inference, but not a strong one, that the defendants received and reviewed the backlog, billing, and sales forecast reports.  Similarly, plaintiffs' unsupported assertion that these reports were produced from Blair's and Boyd's personal files do not give rise to an inference of the requisite state of mind.

   c.   Backlog and forecast reports

   Even if the court assumes that defendants actually received and reviewed the backlog and billings reports, plaintiffs' allegations do not establish a strong inference that defendants knew or acted with deliberate recklessness with respect to the April, June, and July 2002 statements at issue. Plaintiffs rely entirely on the backlog and billings reports to support scienter for the period prior to

---

[19]   That CW8, as a production planner, would use such reports seem the more likely inference.

August 1, 2002.[20] Plaintiffs point only to lower levels of backlog during the second quarter and first month of the third quarter to support that the June and July 2002 third quarter revenue projections were false when made.

In *In re Daou Sys.*, the plaintiff alleged that the defendant "misrepresented its pipeline expectations, stating that its position was extremely strong and remained healthy and would fuel future earnings growth, that visibility of future earnings was outstanding, and that the company's momentum was increasing." 411 F.3d at 1021 (quotations omitted).  There, it was not disputed that the defendant's had access to the pipeline reports.[21]  Nevertheless, citing the heightened pleading requirements of the PSLRA, the Ninth Circuit held "[a]lthough these projections might have been overly optimistic when made, they do not rise to the level of a material misrepresentation actionable after enactment of the PSLRA." *Id.*  Similarly, the lower levels of backlog at various points during April, June, and July (as cited by plaintiffs) may indicate that defendants' third quarter guidance given in June and July were "overly optimistic," but does not rise to the level of actionable fraudulent statements.

While lower backlog may infer lower future revenue, factors other than backlog levels may be relied upon in making revenue projections.[22]  Moreover, lower backlog at the beginning of a

---

[20] Plaintiffs also makes no allegations corroborating defendants' alleged scienter in April, June, or July.  The court's Dec. 2004 Order found that the timing and sales of ESST shares by Blair, Boyd, and Chan "do not suggest that defendants were scheming to keep the price of ESST shares up while they unloaded part of their holdings." Dec. 2004 Order at 15-16.  Blair's sales were made pursuant to a pre-planned trading program established in December 2001. *Id.* at 15.  Boyd's and Chan's sales occurred on February 6, 2002, March 11, 2002, and May 7, 2002. *Id.*

[21] In particular, the Ninth Circuit had found that the plaintiff's pleadings that a confidential witness, who was a vice president in sales and who prepared weekly or bi-weekly sales status/backlog and forecast/pipeline information to the corporate officers satisfied the PSLRA requirements. *In re Daou Sys.*, 411 F.3d at 1016.

[22] For example, during the July 24, 2002 conference call Blair stated "we believe that in Q3, which is the traditionally largest quarter of the year, revenue will be up from our second quarter that we just completed.  This is because our customers are building for the coming holiday season." PTAC ¶ 39.  At oral argument, plaintiffs' counsel suggested that defendants have not pointed to any facts to support their reasons for the statements about third quarter guidance.  However, under the PSLRA it is plaintiffs' burden to plead with particularity that defendants' acted with the requisite state of mind.  Because the court does not find that plaintiffs' allegations establishes a strong inference that defendants' had knowledge prior to August 2002, the court does not reach the consideration of whether defendants have negated the inferences of plaintiffs' allegations by

ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND
C-02-04497 RMW
SPT                                                       13

quarter, without more, does not necessarily render that quarter's revenue likely to fall below expectations.[23] Here, plaintiffs' own allegations indicate that lower backlog at a particular point in time does not automatically translate into lower revenues. Plaintiffs allege that backlog "going into the second quarter" had declined to 22% of forecast revenues compared to backlog going into the first quarter of 37%. PTAC ¶¶ 4, 34. However, ESST's actual second quarter revenue performance exceeded its June 18, 2002 guidance.[24] Decl. Sara M. Folchi Supp. Defs.' Opp. Pls.' Mot. ("Folchi Decl.") Ex. C at 1. In fact, despite lower backlog "going into the second quarter," on June 18, 2002 ESST issued a press release increasing its second quarter guidance with respect to expected revenue and earnings per share, and actual revenues later exceeded that increased guidance. PTAC ¶ 36; Folchi Decl. Ex. B at 1. Thus, it does not follow that knowledge of deterioration in backlog in June or July gives rise to a *strong inference* that the June and July statements about third quarter performance were made with actual knowledge or deliberate recklessness with respect to falsity.

ESST also missed its June 2002 internal forecast by $7.2 million. PTAC ¶ 8. Regardless, ESST still exceeded its second quarter revenue estimates. As with the backlog reports, it is unclear what inferences can specifically be drawn from the missed June forecast. Notably, the PTAC does not provide any factual allegations (such as the bases for the internal forecasts, the accuracy of such forecasts, or defendants' reliance on such forecasts) so that these internally prepared forecast could be evaluated.[25] Thus, the court cannot find that the missed June forecast gives rise to a strong

---

showing that they did *not* act with the requisite state of mind.

[23] As defendants' noted at oral argument, plaintiffs' contention seems to presuppose a upward linear trend in backlog. It remains unclear whether backlog for ESST generally fall at predictable levels from quarter to quarter as might be the case for a company whose orders fall within a predictable cycle each quarter.

[24] Backlog levels likely have inherent variability because of the timing of customer orders and of shipments by the company. Here, although backlog going into the second quarter (presumably around April 1, 2002) was 22% of forecast revenues (compared to 37% going into the first quarter), approximately 19 days later on April 19, 2002 billings and backlog totaled $40.9 million, greater than the $39.6 million at the comparable time for the first quarter. PTAC ¶¶ 4, 34; Pls.' Mot. at 7. Then, on April 22, 2002 shipments and backlog totaled $35 million. PTAC ¶ 56.

[25] In addition, as noted earlier no allegations support that defendants received or reviewed the forecast referred to by plaintiffs since CW14's only statement about the rolling forecast was that he was familiar with and had seen that report before.

inference that defendants' knew their June and July statements about third quarter performance were false when made (or were deliberately reckless with respect to falsity).

### III. ORDER

For the foregoing reasons, the court DENIES plaintiffs' motion for leave to amend as futile.

DATED:     5/30/06

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff(s):**

| | |
|---|---|
| Luke O. Brooks | lukeb@mwbhl.com |
| Patrick J. Coughlin | patc@mwbhl.com |
| Lionel Z. Glancy | info@glancylaw.com |
| Michael M. Goldberg | info@glancylaw.com |
| John K. Grant | johnkg@mwbhl.com |
| Robert A. Jigarjian | raj@classcounsel.com |
| William S. Lerach | billl@mwbhl.com |
| Kevin Ruf | info@glancylaw.com |
| David R. Scott | drscott@scott-scott.com |

**Counsel for Defendant(s):**

Meredith N. Landy    mlandy@omm.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**    5/30/06                                         SPT
                                                     **Chambers of Judge Whyte**